## MATTER OF GONZALEZ-HERNANDEZ

### In DEPORTATION Proceedings

### A-7225688

*Decided by Board February 18, 1964*

(1) A naturalized United States citizen's employment with the Cuban armed forces from February 1959 to January 1961 in connection with which he was scheduled to take the oath of allegiance, was paid by the Cuban army, gave orders to members of the army, wore the army uniform except for a period from March to June 1959, and received a dishonorable discharge from the army in January 1961, constitutes entering the armed forces of Cuba within the meaning of section 349(a)(3), Immigration and Nationality Act.

(2) Respondent lost his United States citizenship under section 349(a)(3) of the Act, having failed to establish that his entry into the armed forces of Cuba was involuntary, since he did not avail himself of the opportunity to protest the wearing of the Cuban army uniform to the United States consul, and following a visit to the United States in March 1959 he returned voluntarily to Cuba and to his employment there, taking his family with him.

CHARGE:

Order: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Immigrant, no visa.

The special inquiry officer, finding respondent to be a United States citizen at time of his last entry, terminated proceedings and certified the case to the Board. The trial attorney asks that the special inquiry officer be reversed and that the respondent be ordered deported on the charge stated above. We find that respondent was an alien at the time of his entry and shall reopen proceedings so that the special inquiry officer may consider the charge.

The issues are whether respondent entered the armed forces of Cuba; and if he did, whether his conduct was voluntary.

Respondent, a 43-year-old married male, a native of Cuba, was admitted to the United States for permanent residence with his wife and daughter on May 18, 1949. He became a citizen by naturalization on April 25, 1958. The Service contends that respondent lost United States citizenship by entering the armed forces of Cuba, and therefore needed a visa on the occasion of his last entry (June 16, 1961) when

472

he was admitted as a United States citizen. The Service relies upon section 349(a)(3) of the Act (8 U.S.C. 1481(a)(3) (1958)) which in pertinent part divests a United States citizen of his nationality for—

entering, or serving in, the armed forces of a foreign state unless, prior to such entry or service, such entry or service is specifically authorized in writing by the Secretary of State and the Secretary of Defense: * * * [1]

Respondent admits that he wore the uniform of and worked with the Cuban armed forces, but claims (1) that he did not "enter" its armed forces, and (2) that his employment was under duress. The special inquiry officer divided respondent's employment into two separate periods. The special inquiry officer found that the first period did not constitute entering the armed forces, and that while the second period did, it did not result in expatriation because it was under duress. The trial attorney contends that the second period was voluntary; in this, the Service representative concurs, and contends in addition, that the first period constituted entering and resulted in expatriation.

Except for a memorandum from the State Department concerning a conversation with the respondent in February 1959, the facts of record concerning respondent's service are derived from his sworn statement made before the Service on June 8, 1962, and his testimony at the deportation hearing on August 21, 1963.

Three returns by respondent to Cuba must be considered. The first return was on January 3, 1959. The record is not clear about the motivation for this return; it appears to have been occasioned by the fact that respondent, a radio technician who had been a supporter of Castro, was approached by Cuban revolutionaries shortly after Castro's successful revolution and asked to contribute his technical skill. Respondent stayed until January 14 when he came back to his family in the United States (p. 6). The second return to Cuba was on January 19, 1959. Respondent's mother-in-law, an employee of the Cuban Government who was in the United States to assist her daughter, a recent mother, received word that she had been fired from her job. Respondent returned to Cuba to help her get her job back (pp. 6–8); while so engaged, he was approached by Comandante Fernandez, Cuban Chief of the Communications Agency (Red Oficial de Communicaciones por Microndas (ROCMIC)) who asked him to help for a period of three or four weeks. Respondent agreed to stay for about a week and a half, but at the request of his superior repeatedly extended the time for short periods (pp. 8–9). Finally, in March 1959, being quite willing to remain in Cuba (pp. 30–31), respondent decided to set up his business in Cuba, reasoning that he would help the Cuban Government and at the same time make a lot

---

[1] We are concerned only with "entering" the armed forces of Cuba.

of money for himself. He went to the United States to get his family and on March 23, 1959, returned with them to Cuba where he remained until June 16, 1961, when he and his family came to the United States. (During this period at a time not disclosed in the record, respondent's wife came to the United States; she returned to Cuba to be with her husband.)

The issue as to entering the armed forces of Cuba is raised by respondent's insistence that he was not officially a member of the armed forces because he had never taken an oath of allegiance to Cuba, and because he wore an army uniform for a limited purpose only; *i.e.*, to enable him to give orders to military personnel.

A uniform was not worn when respondent started his employment (the inspection of radio communications stations in the island and the maintenance of these facilities); however, in January 1959 while engaged in his employment, some source, not designated in the record (p. 9), either denied him use of army facilities or asked why he had not joined the army (p. 9). As a result of this incident, respondent was told by his superior that although he did not have to join the army, he had to wear the army uniform so that the soldiers would take orders from him, for they would not take orders from one in civilian clothing (pp. 9, 26-7). On about February 14, 1959, respondent was given the uniform of a second lieutenant. A day or two later (pp. 1, 26), respondent called at the United States Embassy in Havana and asked what effect wearing of the uniform would have upon his United States citizenship (p. 11; exh. 2, p. 6). His recollection is that he was informed that if he did not take the oath of allegiance to the Cuban flag, he would not lose United States citizenship by his army work, and that the effect of his wearing the uniform was not known to the Embassy official who, however, promised to make inquiry concerning this issue and inform respondent (pp. 11-12). This call at the Embassy is the subject of a memorandum made on February 16, 1959, by the Embassy employee who interviewed respondent (exh. 3). The memorandum reveals that the Embassy employee told the respondent that service in the revolutionary forces was not itself expatriatory, but that if respondent wished to retain his United States citizenship, he should not continue in the service of the revolutionary forces upon their integration into the regular Cuban Army (an event the respondent had told the writer of the memorandum would begin on February 20, 1959).[2] The memorandum further reveals that respondent asked about permission to serve so that he would be exempt from loss of United States citizenship even if he served in the Cuban Army, and

[2] The Rebel Army of Cuba after January 1, 1959, the date on which Castro came to power, is considered the armed forces of a foreign state as that term is used in section 349(a) (3) of the Act (*Matter of M—*, 9 I. & N. Dec. 402).

that this permission was denied. The memorandum was presented to respondent at the hearing; he stated it was "almost exactly" what he had explained to the Embassy employee (p. 12).

Respondent continued to wear his uniform until sometime in March (the special inquiry officer believes it was in the first half but the record is actually not clear as to whether it happened before or after he brought his family to Cuba (pp. 9–10, 26)) when charges that he was plotting against the Cuban Government were brought against him, and by written order "like a regular order from the army" (p. 10) he was told he could no longer wear the uniform (pp. 9–10).[3] The period of employment coincident with the wearing of the uniform (February 14, 1959, to March 1959) is termed by the special inquiry officer the first period of possible army service.

The second period of possible service began in July 1959. The respondent, then working out of uniform in the radio shop (p. 26), was told by his superior that a decision on the accusations had been made in his favor and that he was now free to wear the uniform (p. 11). Respondent protested but was required to wear the uniform (pp. 11, 26–8, 34–5). He wore the military uniform from July 1959 until January 15, 1961, when he was apparently detained under house arrest (p. 13). On January 23, 1961, he was given a dishonorable discharge (p. 13).

Pertinent to the issue as to whether respondent entered the armed forces are these additional facts. The wearing of the uniform authorized respondent to give orders to others in the Cuban Army who were working as half-civilian and half-army people, and to give orders to Cuban military personnel, both those of lower in rank than a second lieutenant and those higher (exh. 2, p. 5). In the beginning respondent had an identification card which did not show him in uniform; this card was replaced by one showing him in his army uniform, but he could not recall whether it identified him as a member of the Cuban Army (p. 7, exh. 2). Whatever papers he signed in the performance of his duties, he signed as a member of the Cuban Army with the rank of a second lieutenant (p. 7, exh. 2). Respondent was paid by the Cuban Government, even during the period he was not permitted to wear his uniform (p. 6, exh. 2). Respondent received the pay of a captain although he had the rank of a lieutenant (p. 28). He never

---

[3] Respondent testified that in March or April 1959 he was no longer in sympathy with Castro (p. 10, exh. 2). (At the hearing he said it was in August 1959 that he became disillusioned (p. 31).) He implied that he had worked against Castro by giving information to an individual whose wife worked in the United States Embassy in Cuba, and he revealed that during an undisclosed period, apparently for sabotage, he had replaced communications equipment in the amount of about $2,000,000 although it was still satisfactory (p. 12, exh. 2).

performed any "military duties" (p. 29) but as part of his job paid civilians, using for this purpose a payroll of $100,000. He stated that on three occasions he had been ordered to take the oath of allegiance but that by arranging trips outside the area during the periods when the oaths were administered, he escaped taking an oath (pp. 12-13, 18-20). He denied he had ever taken an oath to obey the orders of a superior in the Cuban Army or that he had signed papers to obtain the right to wear the uniform (p. 34).

In addition to the defense that his employment did not constitute entering the armed forces of Cuba, respondent advanced as a defense, the claim that his employment with the army was under duress. Respondent believed that he would have been jailed if he had refused to wear the uniform (pp. 34-35). He stated that sometime in March, after he had been instructed that he could no longer wear the uniform, he told his superior that he was going to return to the United States but his superior told him he would have to remain in Cuba (p. 10). A Service contention that it was not fear of force, but rather fear that his family would suffer a reduced income, that constituted respondent's reason for not leaving his job, is based on respondent's answer to the special inquiry officer's question as to whether in July 1959 respondent was willing to work in his occupation for the Cuban Government without wearing a uniform. The doubt raised by respondent's answer that he was obligated to work because he was still receiving his pay (pp. 32-3) and that he could have quit his job in July 1959 but that his wife and four children would have been adversely affected (p. 33) is laid to rest by his answer to additional questioning on the issue. Respondent flatly stated he could not have quit in July 1959, that he had tried to but that he could not have left (p. 33)). Respondent stated that on two or three occasions he had tried to quit but had not been permitted to do so (pp. 30, 33). Upon his return to Cuba with his family in March 1959, respondent and his family were housed in a camp. As a safeguard against the respondent's flight from Cuba, he was not permitted to leave the camp together with his wife: one could leave only if the other remained. He did not communicate this requirement to his wife because he feared the news might make her nervous (p. 23). After respondent had been cleared of the charges against him, he moved out of the camp and thereafter, while his wife and he could go out together, they were shadowed (pp. 23-24). During the period from March 1959 to June 1961 he was warned not to go to the American Embassy (p. 22). After his discharge, he was told to stay in Havana and was barred from government employment (p. 14). His wife tried to arrange for his transportation to the United States through the Swiss Embassy, but was unable to get an interview (p. 14). On April 1, 1961, respondent was placed in a prison where he was put

to work in the water department (p. 14). On April 18, 1961, he was moved to another prison; he was released from this prison by mistake. His wife had, at some undisclosed date, gone to the United States to attempt to arrange for his return to the United States, she had stayed a month and a half and then returned to Cuba (p. 25). After respondent's release by mistake, she, through persistent efforts, secured an interview for him with an official of the Swiss Embassy—the Embassy which was representing the interests of the United States. There, respondent who had a Cuban exit permit dated June 8, 1961, obtained an authorization to enter the United States as a United States citizen. Respondent was admitted as a citizen on June 16, 1961. These proceedings were brought by order to show cause on August 7, 1963.

The special inquiry officer found that the Service had failed to establish that respondent's government work in Cuba during the first period (February 14, 1959, until March 1959) constituted entering the armed forces. His conclusion was based on the following facts: respondent had signed no papers, he had taken no oath of allegiance to Cuba, and he had not in any other way evidenced an intention to accept a commission in the Cuban Army. However, as to the second period (the government work done by the respondent from July 1959 to January 1961)—the special inquiry officer found there had been an entering the armed forces of Cuba. This conclusion was based on the following facts: respondent wore the uniform of an army officer for about a year and a half, he accepted orders from superiors in the armed forces and issued commands to personnel under his jurisdiction, and his salary was paid by the army. Although the special inquiry officer held that this later period of employment constituted entering the armed forces, he held that expatriation had not occurred because it had been under duress. The reasons for this conclusion were that restrictions had been placed upon respondent's liberty of motion and because, had he quit, he would have been unable to support his family.

The trial attorney argues that the respondent's returns to Cuba were voluntary and that his acceptance and performance of his duties of an officer in the Cuban Army during the period from 1959 to 1961 were voluntary. The trial attorney further contends that since respondent voluntarily created the situation in which he found himself, he should not be heard to complain that he continued to serve because of economic necessity.

Respondent's reply brief states that the record has established that respondent's wearing of the uniform was because of his fear of reprisals against himself and his family and that the record establishes the respondent avoided taking an oath of allegiance to the Cuban Government and that he had no intention of serving in the armed forces.

At oral argument, the Service representative contended that respondent's first period of employment constituted entering the armed forces. He pointed out that the respondent had been dishonorably discharged and concluded that a discharge could not have been given unless the respondent has been a member of the armed forces. He contends that respondent expatriated himself when he first went into uniform in February 1959 and cites *Marks* v. *Esperdy*, 315 F. 2d 673 (2d Cir., 1963) (certiorari granted, 11 L. ed 2d 47, October 14, 1963). He contends that even if respondent had been unable to leave Cuba during the latter part of his stay, the fact that he returned to Cuba in March after he had been compelled to wear a uniform is evidence that his entering the armed forces was voluntary.

As to the second period of employment, the Service representative contends that there was an absence of duress. He points out that the respondent returned to the United States in 1959 although accusations were pending against him (we have pointed out that the record is not clear whether the accusations were made before or after the return on March 23, 1959) and that respondent went back to the same employment before he made the trip, again donning the uniform of the Cuban forces. He contends that the fact that respondent returned to Cuba after he had been compelled to wear a uniform is evidence that his service with the Cuban forces started out voluntarily even if it later continued because of fear of punishment. The Service representative concludes that economic necessity was not a factor in respondent's continued employment with the army because respondent could have found other employment. He alleges that respondent worked as a civilian employee for the water department of the government during a period of time and that he went back to his army employment only' because he made better money. (Respondent worked for the water department as a prisoner; there is no support for the statement that he served in the army after working in the water department.)

We find that respondent entered the Cuban Army. We are unable to make a distinction as to the nature of the respondent's employment during the first and the second period. During both periods, respondent was engaged in the same work, gave orders to members of the army, was paid by the army, wore the same uniform, and was under the same leadership. Respondent performed no act initiating the second period of employment which could distinguish its beginning from the circumstances surrounding his original employment with the armed forces. These facts and the existence of a dishonorable discharge and the scheduling of the taking of the oath are strong evidence that he was in fact a part of the army. We, therefore, conclude that the Service has established that the respondent entered the armed forces of Cuba in February 1959 and remained there continu-

ously until his dishonorable discharge, although for a period from March 1959 to June 20, 1959, he was not permitted to wear the uniform and performed services out of uniform.

We further conclude that respondent has failed to bear his burden of establishing that his entry into the armed forces was involuntary.[4] He departed from Cuba in March after he had been put in uniform and had worn the uniform for about a month. He had not protested to the United States consul about the wearing of the uniform although he had the opportunity. He could have refused to return to Cuba; nevertheless, he voluntarily returned and brought his family with him. He returned to the same employment. Clearly, his return under such circumstances rules out any basis for a claim of duress in either the original donning of the uniform or the resumption in the wearing of the uniform. The fact that respondent subsequently found restrictions upon his freedom chafing does not make his entering the army involuntary.

We find respondent became expatriated under section 349(a)(3) of the Act. We shall return the case to the special inquiry officer for consideration of the charge in the order to show cause, and if the charge is sustained, for consideration of applications for relief if any are made.

**ORDER:** It is ordered that the outstanding order of the special inquiry officer be and the same is hereby withdrawn.

*It is further ordered* that the proceedings be reopened for the purposes stated in our opinion and for such further action as the special inquiry officer may deem appropriate.

*It is further ordered* that the order of the special inquiry officer be certified to the Board.

---

[4] Section 349(c) of the Act, 8 U.S.C. 1481(c) (Supp. IV), reads in pertinent part as follows: Whenever the loss of United States nationality is put in issue in any action or proceeding commenced on or after the enactment of this subsection under, or by virtue of, the provisions of this or any other Act, the burden shall be upon the person or party claiming that such loss occurred, to establish such claim by a preponderance of the evidence. * * *